UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-20214-CR-GAYLES/OTAZO-REYES

UNITED STATES OF AMERICA,

v.

ALVARO Y. CORTES, and
OLGA L. AYA RODRIGUEZ,

    Defendants.
_____/

**REPORT AND RECOMMENDATION**

THIS CAUSE came before the Court upon Defendants Alvaro Y. Cortes ("Cortes") and Olga L. Aya Rodriguez's ("Rodriguez") (together, "Defendants") Motion to Suppress Statements (hereafter, "Motion to Suppress") [D.E. 121]. This matter was referred to the undersigned by the Honorable Darrin P. Gayles, United States District Judge, pursuant to Title 28, United States Code, Section 636, for Report and Recommendation [D.E. 127]. The undersigned held an evidentiary hearing on this matter on February 7, 2020 [D.E. 137]. For the reasons stated below, the undersigned respectfully recommends that Defendants' Motion to Suppress be DENIED.

**PROCEDURAL AND FACTUAL BACKGROUND**

On April 18, 2019, the grand jury returned an Indictment against Defendants, charging them with the following offenses:

    Count 1:    Conspiracy to commit an offense against the United States, from May 20, 2014 to December 1, 2015, in violation of 18 U.S.C. § 371.

    Counts 2-6:    Smuggling of fish and wildlife on May 20, 2014, November 25, 2014, and July 22, 2015, in violation of 18 U.S.C. § 554.

See Indictment [D.E. 3]. Planet Express Cargo & Courier Corp. ("Planet Express"), which is Defendants' company, is also charged in Counts 1-6 of the Indictment. Id. Three other defendants in the case, Luis David Cuartas Gaviria, Juan Pablo Cuartas Gaviria, and Aquarium Marketing Corp. (collectively, "the Gaviria Defendants") have entered guilty pleas [D.E. 88].

The Indictment alleges that Planet Express was a freight forwarding company and that Cortes and Rodriguez were its President and Vice President, respectively. See Indictment [D.E. 3 at 1-2]. In Count 1, Defendants are charged with conspiring to knowingly export certain species of corals and tropical fish, knowing that they were transported and sold in violation of the federal Lacey Act, Title 16, United States Code, Sections 3372(a)(1), 3372(d) and 3373(d)(1)(A) and applicable regulations, and the smuggling statute, 18 U.S.C. § 554. Id. at 3-7. The remaining counts charge substantive smuggling offenses. Id. at 8-9. According to the Indictment, the Gaviria Defendants were the source of the fish and wildlife, which were concealed in boxes with false documentation and illegally exported by Defendants and Planet Express via United Parcel Service from Miami to Colombia. Id. at 5-7.

On November 17, 2015, law enforcement officials executed a search warrant at Planet Express. While the search warrant was being executed, law enforcement officials interviewed Cortes and Rodriguez at Planet Express without Mirandizing them. Those interviews were recorded and later transcribed and translated from Spanish to English.

Defendants seek to suppress all statements made during their respective interviews, arguing that they were in custody at the time and that the failure to Mirandize them rendered their statements inadmissible at trial. See Motion to Suppress [D.E. 121].

The government counters that Defendants' non-Mirandized statements are admissible at trial because they were not in custody at the time of their respective interviews. See Government's Response to Defendants' Motion to Suppress (hereafter, "Response") [D.E. 124].

## APPLICABLE LAW

"The Fifth Amendment provides that '[n]o person . . . shall be compelled in any criminal case to be a witness against himself." United States v. Alvarez, 732 F. App'x 729, 732 (11th Cir. 2018) (citing U.S. Const. amend. V). "In Miranda, the Supreme Court established that statements made during a custodial interrogation are not admissible at trial unless the defendant was first advised of her rights, including the right against self-incrimination." Alvarez, 732 F. App'x at 732 (citing Miranda v. Arizona, 384 U.S. 436, 444-45 (1966)).

"An individual is 'in custody' for Miranda purposes where there is a 'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." Alvarez, 732 F. at 732 (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983)). "Courts determine whether an individual was 'in custody' based on whether, under the totality of the circumstances, an objectively reasonable person in her position would have felt that her freedom of movement was restrained to such an extent that she would not feel free to leave." Alvarez, 732 F. App'x at 732 (citing United States v. McDowell, 250 F.3d 1354, 1362 (11th Cir. 2001)). While not an exhaustive list, some factors the Court considers when assessing the totality of the circumstances include: (1) whether the officers unambiguously advised the defendant that he is free to leave and is not in custody; (2) whether the officers brandished weapons or touched the defendant; (3) whether the officers used a language or tone indicating that compliance with their orders could be compelled; (4) the location and duration of the interview; (5) the presence or absence of physical restraints during the interview; and (6) the release of the defendant at the end of the interview. See

3

Howes v. Fields, 565 U.S. 499, 509 (2012); United States v. Lazarus, 552 F. App'x 892, 894 (11th Cir. 2014); United States v. Caswell, 788 F. App'x 650, 653 (11th Cir. 2019); United States v. Brown, 441 F.3d 1330, 1349 (11th Cir. 2006); United States v. Luna-Encinas, 603 F.3d 876, 881-82 (11th Cir. 2010); United States v. Maldonado, 562 F. App'x 859, 861-62 (11th Cir. 2014).

"This test is from the perspective of a reasonable innocent person, and 'the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant." Alvarez, 732 F. App'x at 732 (11th Cir. 2018) (citing Brown, 441 F.3d at 1347).

## FINDINGS OF FACT

### I. Testimonial and documentary evidence

The following witnesses testified at the February 7, 2020 evidentiary hearing: U.S. Fish & Wildlife Service ("USFWS") Special Agent Fernando Gattorno ("Agent Gattorno"); Cortes; and Rodriguez. See Clerk's Exhibit and Witness List [D.E. 138]. The following items were admitted into evidence at the evidentiary hearing:

> ➢ Government Exhibit SH-1 – A compact disc ("CD") containing the audio of Cortes' recorded interview
>
> ➢ Government Exhibit SH-1A – The transcription of Cortes' recorded interview and its translation from Spanish to English.
>
> ➢ Government Exhibit SH-2 – A CD containing the audio of Rodriguez's recorded interview.
>
> ➢ Government Exhibit SH-2A – The transcription of Rodriguez's recorded interview and its translation from Spanish to English.

> ➢ Government Exhibit - SH-3 – photographs of the break room at Planet Express where Cortes' and Rodriguez's respective interviews took place.

Id.

## II. Facts

### A. Stipulated Facts

1. Cortes' interview began at approximately 9:38 A.M. and ended at approximately 11:58 A.M.

2. Rodriguez's interview began at approximately at approximately 12:06 P.M. and lasted approximately one hour.

3. The transcriptions and translations of Cortes and Rodriguez's respective recorded interviews are accurate.

### B. Agent Gattorno

4. Agent Gattorno was the lead agent responsible for the low risk search warrant executed at Planet Express on November 17, 2015 from approximately 9:30 A.M. to 7:00 P.M.

5. Agent Gattorno's team was comprised of 13 law enforcement officials, including himself, who were carrying sidearms, along with 5 unarmed wildlife inspectors (collectively, the "Search Team").

6. All members of the Search Team wore vests marked with law enforcement insignia and prominently displayed their badges.

7. The Search Team arrived at Planet Express in marked law enforcement vehicles without their sirens activated.

8. At the time of the Search Team's arrival at approximately 9:30 A.M., Planet Express, which is located in a warehouse, was open for business.

9. Agent Gattorno approached Cortes to identify himself and explain the search warrant to him. Agent Gattorno and Cortes communicated in Spanish because Cortes is not fluent in English and Agent Gattorno is fluent in Spanish.

10. Agent Gattorno requested that the Planet Express employees who were present during the execution of the search warrant exit the office area of the warehouse and gather in the general warehouse area to ensure that evidence was not destroyed or corrupted.

11. Agent Gattorno did not task members of the Search Team with surveilling and escorting Planet Express employees while the search warrant was being executed.

12. During the execution of the warrant: Planet Express was permitted to remain operational and did receive deliveries; its employees could continue working as long as they did not impede the execution of the search warrant; if they chose not to continue working, Planet Express employees could leave whenever they wished but could not return to the premises due to concerns for officer safety; at no point were the employees physically restrained, cuffed, or segregated from one another; and those employees who did stay were working.

13. Agent Gattorno's conversation with Cortes began in the warehouse, but then moved to Planet Express' main office, which had windows. However, due to the surrounding noise caused by the execution of the search warrant, Agent Gattorno asked Cortes if there was another more quiet and comfortable location where they could sit and talk.

14. Cortes suggested that they speak in Planet Express' windowless break room which had a dining table, chairs, refrigerator, microwave, and coffee maker. See Government Exhibit - SH-3.

15. During Cortes' interview, one or two Search Team members were present along with Agent Gattorno. See generally Government Exhibit SH-1A.

16. The interview took place while the parties were seated at the dining table in the break room.

17. Agent Gattorno recorded the interview with Cortes but did not advise Cortes that he was doing so.

18. Agent Gattorno requested Cortes' permission to close the door to the break room due to the noise caused by the execution of the search warrant. Cortes consented, and the door was shut, but never locked.

19. During Cortes' interview, other members of the Search Team sporadically entered the break room to update Agent Gattorno about the search.

20. During Cortes' interview, Agent Gattorno advised Cortes that: he was not being detained; he was not under arrest; he could leave Planet Express at any time but would not be allowed to return; and Planet Express could remain operational.

21. During the interview, Cortes complimented Agent Gattorno's Spanish and offered him water.

22. The tone of the interview was friendly, non-confrontational, and non-hostile.

23. Cortes was not restrained in any way during the interview.

24. Cortes never asked to leave or terminate the interview.

25. Once the interview ended, Cortes left the break room and was not placed under arrest.

26. Thereafter, Agent Gattorno approached Rodriguez, who was seated with other Planet Express employees at a vantage point where she could observe Cortes freely exit the break room, and requested permission to speak with her in the break room.

27. Rodriguez agreed.

28. During the course of her interview, which also took place in Spanish and was recorded, Agent Gattorno advised Rodriguez that Planet Express could remain operational and that he was asking her questions with her permission. Agent Gattorno did not advise Rodriguez that the interview was being recorded.

29. Agent Gattorno did not advise Rodriguez that she was going to be arrested or was not free to leave.

30. The tone of Rodriguez's interview was generally friendly. At one point, when Agent Gattorno doubted the veracity of Rodriguez' responses, he warned her that she could be charged for providing false information to a federal agent. See Government Exhibit SH-2A CB-000419-21. While issuing this warning, Agent Gattorno did not raise his voice or threaten to arrest Rodriguez.

31. Rodriguez never asked to leave to break room during the course of the interview.

32. Once Rodriguez's interview concluded, she was escorted out of the break room and back to the general warehouse area.

33. Agent Gattorno never came into physical contact with anyone at Planet Express.

34. The undersigned finds Agent Gattorno's testimony to be credible.

***C. Cortes***

35. On November 17, 2015, Cortes arrived at Planet Express at approximately 9:00 A.M.

36. At approximately 9:30 A.M., a Planet Express employee notified Cortes, who was in the warehouse at the time, that the Search Team had arrived outside.

37. Cortes exited the warehouse to greet the Search Team and observed: 8-10 marked law enforcement vehicles parked in front of the warehouse without their sirens activated; and 18

8

law enforcement officials, wearing badges and vests with law enforcement insignia. The armed members of the Search Team had their weapons holstered.

38. Planet Express employees created a makeshift sitting area in the general warehouse area while the search warrant was being executed.

39. Agent Gattorno asked if he could speak with Cortes in a private area. Cortes agreed and advised that the break room would be the best place to speak. The break room was also the only room available at the time because the search was being conducted in the other rooms.

40. The other member of the Search Team present in the break room during Cortes' recorded interview was armed with a sidearm—which was holstered.

41. During the interview, Cortes took a bottle of water for himself and also offered water bottles to the officers.

42. Planet Express employees were required to stay out of the break room during Cortes' interview.

43. At no point on November 15, 2017 was Cortes: physically restrained or placed in handcuffs; frisked; or touched by members of the Search Team.

44. Cortes never witnessed any member of the Search Team draw their holstered sidearms.

45. While the search warrant was being executed, Cortes used the restroom on a few occasions but asked for permission before doing so.

46. Once the search warrant had been executed and the Search Team had left Planet Express, Cortes and Rodriguez closed Planet Express and went home. By that time, all Planet Express employees had already left.

47. The undersigned finds Cortes' testimony to be credible.

### D. *Rodriguez*

48. Rodriguez arrived at Planet Express at approximately 10:00 A.M., while the search warrant was being executed. Upon her arrival, members of the Search Team requested that she identify herself but did not search her.

49. Rodriguez observed Planet Express employees sitting in the general warehouse area and was aware that Cortes was being interviewed in the break room.

50. The search warrant was being executed during Cortes' interview.

51. While the search warrant was being executed, Rodriguez was permitted to use the restroom but was escorted to and from it by a female member of the Search Team.

52. Rodriguez observed Cortes leave the break room freely.

53. During Rodriguez's interview, the door to the break room was closed but not locked and Agent Gattorno advised her that: she was not under arrest; she was not detained; and she could leave Planet Express at any time but would not be able to return if she did.

54. One other member of the Search Team participated in Rodriguez's interview. See generally Government Exhibit SH-2A.

55. Rodriguez never requested to leave the break room or terminate the interview.

56. At no point on November 17, 2015 did members of the Search Team: draw their sidearms; restrain or come into physical contact with Rodriguez; search Rodriguez; take her cellular phone; or physically restrain or arrest any Planet Express employees.

57. Following her interview, Rodriguez returned to the general warehouse area and was permitted to move about freely.

58. Once the search warrant had been fully executed and the Search Team had left Planet Express, Rodriguez and Cortes closed the warehouse.

59. The undersigned finds Rodriguez's testimony to be mostly credible but notes that she equivocated in some of her answers.

## CONCLUSIONS OF LAW

As previously stated, courts consider the following factors when determining whether an objectively reasonable person in Defendants' position would have felt that their freedom of movement was restrained to such an extent that they would not have felt free to leave: (1) whether the officers unambiguously advised the defendant that he is free to leave and is not in custody; (2) whether the officers brandished weapons or touched the defendant; (3) whether the officers used a language or tone indicating that compliance with their orders could be compelled; (4) the location and duration of the interview; (5) the presence or absence of physical restraints during the interview; and (6) the release of the defendant at the end of the interview. See Howes, 565 U.S. at 509; Lazarus, 552 F. App'x at 894; Caswell, 788 F. at 653; Brown, 441 F.3d at 1349; Luna-Encinas, 603 F.3d at 881-82; Maldonado, 562 F. App'x at 861-62.

Based on the foregoing factual findings and legal authorities, the undersigned concludes as follows.

***First.*** ***Cortes was not in custody during his interview***

As to the first factor, Cortes was clearly advised during his interview that he was not under arrest or being detained and that he could leave Planet Express at any time. Such advice is a "powerful factor" when considering the totality of the circumstances and "generally will lead to the conclusion that the defendant is not in custody." See Brown, 441 F.3d at 1347.

As to the second factor, at no point did Agent Gattorno or any member of the Search Team unholster their sidearms or touch Cortes, which supports a finding that Cortes was not in custody during his interview. See Luna-Encinas, 603 F.3d at 881-82.

11

As to the third factor, the tone of the Cortes' interview was friendly, non-confrontational, and non-hostile, which also supports a finding that Cortes was not in custody during his interview. See id.

As to the fourth factor, Cortes' interview took place in Planet Express' break room at his suggestion. The break room had a dining table, chairs, refrigerator, microwave, and coffee maker and was a location familiar to Cortes. With Cortes' permission, the door to the break room was closed, but not locked, to minimize outside noise. Courts are much less likely to find the circumstances custodial when the interrogation occurs in familiar or neutral surrounding. United States v. Matcovich, 522 F. App'x 850, 851 (11th Cir. 2013) (citing Brown, 441 F.3d at 1348). Additionally, Cortes' interview lasted approximately two-and-a-half-hours. In Yarborough v. Alvarado, 541 U.S. 652, 665 (2004), the Supreme Court held that the two-hour interview of a juvenile defendant who had not been advised that he was free to leave supported a finding that the juvenile was in custody during his interview. Id. However, in United States v. Salman, 286 F. Supp. 3d 1325, 1344 (M.D. Fla. 2018), the District Court classified a less than three-hour interview as a "relatively short duration" and held that the defendant was not in custody at that time because the defendant: was interviewed in an FBI conference room; was not physically restrained; had fallen asleep while waiting for the interviewing officer to arrive; and volunteered to stay behind to answer additional questions. Id. The undersigned finds Salman to be more analogous with the instant case than Yarborough and concludes that Cortes' two-and-a-half-hour interview similarly supports a finding that he was not in custody.

As to the fifth factor, at no time on November 15, 2017 was Cortes physically restrained or placed in handcuffs, which supports a finding that Cortes was not in custody during his interview. See United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996).

12

<u>As to the sixth factor</u>, Cortes was released at the conclusion of his interview and not placed under arrest on November 17, 2015, which supports a finding that Cortes was not in custody during his interview. See <u>Maldonado</u>, 562 F. App'x at 861.

Weighing the forgoing factors, the undersigned concludes that, under the totality of the circumstances, an objectively reasonable person in Cortes' position would not have felt that his freedom of movement was restrained to such an extent that he would not have felt free to leave. Therefore, Cortes' non-Mirandized statements are admissible at trial. See <u>Howes</u>, 565 U.S. at 509; <u>Lazarus</u>, 552 F. App'x at 894; <u>Caswell</u>, 788 F. at 653; <u>Brown</u>, 441 F.3d at 1349; <u>Luna-Encinas</u>, 603 F.3d at 881-82; <u>Maldonado</u>, 562 F. App'x at 861-62.

***Second.*** *Rodriguez was not in custody during her interview*

<u>As to the first factor</u>, like Cortes, Rodriguez was clearly advised during her interview that she was not under arrest or being detained and that she could leave Planet Express at any time. Again, this advice is a "powerful factor" when considering the totality of the circumstances and "generally will lead to the conclusion that the defendant is not in custody." See <u>Brown</u>, 441 F.3d at 1347.

<u>As to the second factor</u>, at no point did Agent Gattorno or any member of the Search Team unholster their sidearms or touch Rodriguez, which supports a finding that Rodriguez was not in custody during her interview. See <u>Luna-Encinas</u>, 603 F.3d at 881-82.

<u>As to the third factor</u>, the tone of the Rodriguez's interview was generally friendly. At one point, when Agent Gattorno doubted the veracity of her responses, he warned her that she could be charged for providing false information to a federal agent. See Government Exhibit SH-2A CB-000419-21. While issuing this warning, Agent Gattorno did not raise his voice or threaten to arrest Rodriguez. At the evidentiary hearing, Rodriguez argued that Agent Gattorno's warning

supported a finding that Rodriguez was in custody at the time of her interview. However, Agent Gattorno's warning is simply one of a number of factors for the Court's consideration when determining whether a defendant was in custody at the time of their interrogation. See Stansbury v. California, 511 U.S. 318, 325 (1994) ("[A]n officer's views concerning the nature of an interrogation, or beliefs concerning the potential culpability of the individual being questioned, may be one among many factors that bear upon the assessment whether that individual was in custody[.]"). In this case, Agent Gattorno's warning to Rodriguez that she not perjure herself was not sufficiently threatening to make an objectively reasonable person in her position feel that her freedom of movement was restrained to such an extent that she would not have felt free to leave. See Caswell, 788 F. App'x at 653 (holding that the district court did not err in finding that an objectively reasonable person likely would have felt free to leave when six or seven officers, who were executing a search warrant, accused the defendant of lying for up to three hours in light of the fact that the defendant had agreed to speak with those officers in his backyard and had been advised that he: was free to leave; was not going to be arrested; and could refuse to speak to them); Lazarus, 552 F. App'x 892, 894-95 (holding that an officer's accusatory statement during the defendant's interview "did not transform the interview into a custodial interrogation.").

As to the fourth factor, Rodriguez's interview also took place in Planet Express' break room, which was a location familiar to Rodriguez. During Rodriguez's interview, the door to the break room was closed, but not locked, to minimize outside noise. As previously noted, courts are much less likely to find the circumstances custodial when the interrogation occurs in familiar or neutral surrounding. Matcovich, 522 F. App'x at 851 (citing Brown, 441 F.3d at 1348). Moreover, Rodriguez's interview lasted approximately one hour, which does not support a finding that Rodriguez was in custody. See United States v. Sosa, No. 15-CR-20170, 2015 WL 6751062,

14

at *3 (S.D. Fla. Nov. 5, 2015) (classifying an interview lasting about an hour as "short," which did not support a finding that the defendant was in custody).

As to the fifth factor, at no time on November 15, 2017 was Rodriguez physically restrained or placed in handcuffs, which supports a finding that Rodriguez was not in custody during her interview. See Moya, 74 F.3d at 1119.

As to the sixth factor, like Cortes, Rodriguez was released at the conclusion of her interview and not placed under arrest on November 17, 2015, which supports a finding that Rodriguez was not in custody during her interview. See Maldonado, 562 F. App'x at 861.

Weighing the forgoing factors, the undersigned concludes that under the totality of the circumstances an objectively reasonable person in Rodriguez's position would not have felt that her freedom of movement was restrained to such an extent that she would not have felt free to leave. Therefore, Rodriguez's non-Mirandized statements are admissible at trial. See Howes, 565 U.S. at 509; Lazarus, 552 F. App'x at 894; Caswell, 788 F. at 653; Brown, 441 F.3d at 1349; Luna-Encinas, 603 F.3d at 881-82; Maldonado, 562 F. App'x at 861-62.

## RECOMMENDATION

In accordance with the foregoing, the undersigned respectfully recommends that Defendants' Motion to Suppress be DENIED. Pursuant to Local Magistrate Judge Rule 4(b), the parties have **fourteen days** from the date of this Report and Recommendation to file written objections, if any, with the Honorable Darrin P. Gayles. Failure to timely file objections shall bar the parties from attacking on appeal the factual findings contained herein. See Resolution Tr. Corp. v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993). Further, "failure to object in accordance with the provisions of [28 U.S.C.] § 636(b)(1) waives the right to challenge on

appeal the district court's order based on unobjected-to factual and legal conclusions." See 11th Cir. R. 3-1 (I.O.P. - 3).

   RESPECTFULLY SUBMITTED in Miami, Florida this 21st day of February, 2020.

                      _____
                      ALICIA M. OTAZO-REYES
                      UNITED STATES MAGISTRATE JUDGE

cc:  United States District Judge Darrin P. Gayles
    Counsel of Record